# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| -vs- ) | Case No. CR-22-368-F |
| ) | |
| JOEL KEENAN LEWIS, ) | |
| ) | |
| Defendant. ) | |

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| -vs- ) | Case No. CR-22-395-F |
| ) | |
| LEQUEVIN KELLEY, ) | |
| ) | |
| Defendant. ) | |

## **ORDER**

I.  Introduction.

Under 18 U.S.C. § 922(g)(3), it is a federal offense for a person "who is an unlawful user of or addicted to any controlled substance" to possess a firearm which has moved in interstate commerce. The government charges that Joel Keenan Lewis, "with knowledge that he was an unlawful user of a controlled substance," knowingly possessed a .38 caliber revolver and a .380 pistol on or about January 23, 2021. Doc. no. 1 in CR-22-368. As for the defendant Lequevin Kelley, the government charges that "with knowledge that he was an unlawful user of a controlled substance," he

knowingly possessed a .38 special revolver on or about August 25, 2022.  Doc. no. 7 in CR-22-395.

Both defendants moved to dismiss their indictment, relying mainly on the Supreme Court's recent decision in New York State Rifle & Pistol Association, Inc. v. Bruen, 142 S.Ct. 2111 (2022), in which the Court elaborated on its Second Amendment holdings in District of Columbia v. Heller, 554 U.S. 570 (2008) and McDonald v. City of Chicago, 561 U.S. 742 (2010).  The matter has been briefed on both sides, and the briefing was augmented by helpful oral arguments held on December 21, 2022.

As will be seen, the issues presented by these motions come down to a question of just how close a historical analogue must be in order to satisfy Bruen's requirement, broadly speaking, that, in order to pass muster under the Second Amendment, a present-day prohibition on possession of a gun must have a sufficient resemblance to gun legislation as it existed at or reasonably near the time the Second Amendment was proposed and ratified.  Those issues are discussed in parts III and IV, below.  However, as an initial matter, two nonstarters (one advanced by the defendants and the other advanced by the government) must be addressed.

II.   Nonstarters.

   A.   The defendants' nonstarter.

Both defendants argue that Section 922(g)(3) is unconstitutionally vague on its face.  *See*, doc. no. 22, at 2, in CR-22-368, and doc. no. 17, at 18, in CR-22-395.[1]

The court concludes (quite easily), on the basis of binding Tenth Circuit authority, that the vagueness challenges are premature.  These claims of

---

[1] As a formal matter, defendant Kelley's motion argues that Section 922(g)(3) is unconstitutionally vague as applied.  However, Kelley's argument is not supported by any factual context at all (*i.e.*, facts he would acknowledge, at least for purposes of the motion, to be relevant and reliable for the purpose of putting his vagueness challenge in a factual context), which effectively makes his challenge, although articulated as an "as applied" challenge, a facial challenge.

unconstitutional vagueness can and should be adjudicated only on the basis of a reasonably well-developed factual record (typically a record made at trial), which the court does not have here. United States v. Wells, 38 F.4th 1246, at 1258 (10th Cir. 2022) (in absence of First Amendment claim, vagueness challenge must be examined in light of the facts of the case at hand), and United States v. Reed, 114 F.3d 1067, at 1070-71 (10th Cir. 1997) (same).

  B. The government's nonstarter.

The government is keenly (and quite understandably) interested in avoiding the sort of historical inquiry, to support the constitutionality of Section 922(g)(3), that accounted for 21 pages of the Supreme Court Reporter in Bruen. The gist of the government's argument for avoiding that historical inquiry is that if an individual charged with a federal gun crime is not "virtuous" and "law-abiding," then he has no Second Amendment protection in the first place, an argument which would permit the government to cut off at the pass any need for historical analysis like that which occupied the Supreme Court at such great length in Bruen. At argument on these motions, the government concisely summarized its position as follows:

> [MR. McCRARY:] And because Congress, in this particular instance, identified those who are unlawful users of controlled substances or addicts as people who present a legitimate threat to the orderly state, that they should not be included in those people protected by the Second Amendment in the first instance.
>
> THE COURT: I want to get some understanding. What is the benefit to the government, from the government's perspective, if I do this historical inquiry at the first step rather than the second step? Is it that the historical inquiry at the first step is less exacting?
>
> MR. McCRARY: It speaks to the broader issue of the authority of the Legislature to except individuals from that

> protection. It doesn't require the same level of historical analogue. You can address a broader picture, for sure.
>
> If you move to the second step, we fully concede at the second step, then, it becomes the government's burden to show that there are relevant historical analogues, which we believe there are, in any event. But at this first step, were the Court to conclude, as the Third Circuit did, as the Seiwert court did, that –
>
> THE COURT: So if I'm in this broad category of nasty people, then I don't even get the benefit of an exacting historical inquiry at the second step?
>
> MR. McCRARY: That would be correct, Your Honor.

Transcript of December 21, 2022 hearing (excerpt), doc. no. 34, at 6-7.

    This contention, focusing on a defendant's status rather than on his conduct ("conduct," being some activity we would ordinarily expect the Second Amendment to protect) for the purpose of ascertaining whether he can even invoke Second Amendment protection, has been roundly rejected by district judges in this state and circuit. *See, e.g.*, United States v. Jones, CR-22-0376-JD, W.D. Okla., doc. no 59, at 5-9 (Dec. 23, 2022); United States v. Gray, 2022 WL 16855696, *3 (D. Colo. Nov. 10, 2022); United States v. Jordan, CR-22-0339-JD, W.D. Okla., doc. no. 29, at 5-7 (Oct. 25, 2022); United States v. Coombes, 2022 WL 4367056, at *3-4 (N.D. Okla. September 21, 2022); United States v. Kays, CR-22-0040-D, W.D. Okla., doc. no. 86, at 5 (Aug. 29, 2022); and United States v. Jackson, CR-22-0059-D, W.D. Okla., doc. no. 45, at 4-5 (Aug. 19, 2022). The court sees no reason to repeat here the excellent discussions of this issue by, for instance, Judge Frizzell in Coombes and Judge Dishman in Jones and Jordan. The short of the matter is that, unlike Joe Btfsplk in Li'l Abner, Messrs. Lewis and Kelley don't walk around with dark clouds

over their heads for Second Amendment purposes just because the government deems them unvirtuous and not law abiding.

III. Does § 922(g)(3) require the government to show a "distinctly similar historical regulation" or just a "relevantly similar" historical regulation?

In Bruen, the Court summarized its essential holding by telling us that if an individual's conduct (not his status) is covered by the plain text of the Second Amendment, the "government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." Bruen, 142 S.Ct. at 2130. But, as is clear from the Court's opinion, determinations under this broad holding are more complicated than the holding itself might suggest. Defendant Kelley argues, and defendant Lewis agrees, that the Court, in Bruen, articulated two distinct levels of scrutiny that are potentially applicable to an assessment of the adequacy of the analogue[2] the government proffers for the purpose of establishing the constitutionality of a law criminalizing possession of a gun. The argument is that where the challenged statute addresses a *general societal problem* that has persisted since the 18th century, the government must provide examples of "distinctly similar" historical regulations, but, on the other hand, where the modern statute reflects "unprecedented social concerns or dramatic technological changes," the government need only show "relevantly similar" historical analogues. Doc. no. 17 in CR-22-395, at 7 (quoting from Bruen at 2131 and 2132). The point made by the defendants is that the "distinctly similar" standard is more demanding than the "relevantly similar" standard. Defendants accordingly argue that the "distinctly similar" standard should control here. The government's briefs presuppose that the

---

[2] As will be discussed in more detail, what the Court required in Bruen is a historical "analogue" to the challenged provision if a "dead ringer" can't be found. The majority opinion speaks of "analogies" and "analogues" in discussing *both* the "distinctly similar" and "relevantly similar" standards discussed in this order, although that terminology is understandably used much more frequently in the discussion of the "relevantly similar" standard. *E.g.*, 142 S.Ct. at 2131-33.

5

more lenient "relevantly similar" standard should apply, without, in terms, addressing the differences between the two standards or explaining its reasoning in going straight to the more lenient of the two standards.

Although the Bruen majority opinion is not unmistakably clear on this point, the court concludes, upon careful reading of that opinion, that it does articulate two standards for assessment of the government's proffered historical analogues, depending on whether the "challenged regulation addresses a general societal problem that has persisted since the 18th century," 142 S.Ct. at 2131, or whether the statute addresses "unprecedented societal concerns or dramatic technological changes." *Id.* at 2132.  In the former case, the Court tells us that "the lack of a *distinctly similar* historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* at 2131 (emphasis added).  On the other hand, under the more lenient standard, "reasoning by analogy" in aid of "a determination of whether the two regulations are *relevantly similar*" is permissible.  *Id.* at 2132 (emphasis added; internal quotation omitted).  This is so even though, as has been noted, the Court talked about "analogues" in discussing both standards.[3]  One thing that is not clear from the Bruen majority opinion (and could not have been made clear without extended discussion by way of dictum) is just how, in practice, the difference between the two standards might make a difference in outcomes in other cases in the lower courts.

---

[3] As recognizing the distinction between the two formulations, *see* United States v. Melendrez-Machado, 2022 WL 17684319 (W.D. Tex. Oct. 18, 2022), at *3 ("Defendant argues the 'distinctly similar' standard applies because the danger posed by felons is a general societal problem that has existed since the founding.  However, the 'relevantly similar' standard applies here . . . .") (felon in possession case under § 922(g)(1)).  *See also*, United States v. Connelly, 2022 WL 17829158 (W.D. Tex. Dec. 21, 2022), at *1, n. 3 (recognizing that some courts have recognized the distinction).

Defendant Kelley argues, without elaboration, that the more stringent "distinctly similar" standard should apply because § 922(g)(3) does not address "unprecedented societal concerns or dramatic technological changes." Doc. no. 17 in CR-22-395, at 8.[4] It is ultimately not necessary for the court to determine which standard applies to the determination of the adequacy of the historical analogue proffered by the government because, as will be seen, the court concludes that the government would prevail even under the more stringent "distinctly similar" standard.

IV.  <u>The government has identified an adequate historical basis for § 922(g)(3)</u>.

For the reasons discussed above, and out of an abundance of caution, the court applies the more stringent "distinctly similar" standard in determining whether the government has demonstrated the existence of an adequate historical analogue.

As an initial matter, it is worth noting that, compared to some gun legislation–old and new–§ 922(g)(3) treads fairly lightly. For one thing, § 922(g)(3) does not define a regulatory offense–the defendant must be shown to have "knowingly" violated the statute. 18 U.S.C. § 924(a)(8). The defendant's use of a controlled substance must be *current* use. Thus, the government must prove that the defendant's use of the controlled substance was "ongoing and contemporaneous with the commission of the offense." <u>United States v. Wilson</u>, 979 F.3d 889, 916 (11th Cir. 2020) (quoting from <u>United States v. Edmonds</u>, 348 F.3d 950, 953 (11th Cir. 2003). *See also*, <u>United States v. Cook</u>, 914 F.3d 545, 554 (7th Cir. 2019), <u>vacated on other grounds</u>, 140 S. Ct. 41 (2019) ("regular and ongoing use" of the controlled substance). So, in contrast to the operation of some other subdivisions of § 922(g), subdivision (3) does not disarm anyone for life.

---

[4] It was clear at argument that defendant Lewis agrees, although this issue as to selection of the applicable standard is not addressed in his brief.

It is evident from the majority opinion in <u>Bruen</u> that a historical analogue proffered by the government in support of the constitutionality of a statutory prohibition of gun possession shouldn't be too old, too new, too isolated, or too British. 142 S.Ct. at 2138-56. It should not be noticeably less burdensome than the challenged provision (for instance, in terms of the extent and duration of the restraint or prohibition). *Id.* at 2148-50. That said, it is also worth noting that Justice Kavanaugh, although joining the Court's opinion, wrote a concurring opinion, in which the Chief Justice joined. If we read that concurrence as an indication of how far the concurring Justices might go in applying the broad pronouncements of the majority opinion, it is fair to say that the tone of the joint concurrence throttles back just a bit on what one might otherwise infer from the 6-to-3 majority opinion in terms of how close a historical analogue has to be in order to support the constitutionality of a modern gun law. This court's determination of whether a historical analogue is good enough under <u>Bruen</u> is also influenced by an assumption that it is unlikely that the Supreme Court intended to sign up for decades of resolution of circuit splits (to say nothing of decades of divergent outcomes among 50 state courts of last resort) as the lower courts sort through the infinite number of possible permutations–variations in causes for restrictions, types of guns covered, types of conduct covered, severity and duration of the burden, and procedural niceties, to name but a few–in gun legislation.

Returning to the <u>Bruen</u> majority opinion itself, the government's burden is to "prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." 142 S.Ct. at 2127. One reference point is a comparison of the severity of the burden imposed by the modern regulation versus the proffered historical analogue. *Id.* at 2128 (noting that the "purported analogue" advanced in <u>Heller</u>, 554 U.S. 570 (2008) did not "remotely burden the right of self-defense as much as an absolute ban on handguns." *Id.* (quoting from

Heller at 632). Thus, in Bruen, the Court was unimpressed with New York's proffer of the colonial era surety laws as historical analogues because they were far less restrictive of the pre-existing right to carry arms than the New York law that made it a crime even to possess a handgun without a showing of "proper cause" to the satisfaction of a local official. *Id.* at 2148. This was the Court's application, in Bruen, of the analytical dichotomy it described as follows:

> To be clear, analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check. On the one hand, courts should not uphold every modern law that remotely resembles a historical analogue, because doing so risks endorsing outliers that our ancestors would never have accepted. On the other hand, analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster.

*Id.* at 2133 (emphasis in original; citations and quotations omitted).

With these understandings in mind, the court turns to the question of whether the historical analogues proffered by the government in these two cases are adequate to sustain the constitutionality of § 922(g)(3).

In the court's view, Bruen's requirement of an apt historical analogy–one that is close enough that it fairly demonstrates that the modern legislation is consistent with the Nation's historical tradition of firearm regulation–is satisfied in a case under § 922(g)(3) if there is a common thread, comparing the new law to the old, of legislative response to the heightened danger to the public arising from possession of a gun by an individual who, because of a mental condition or due to current use of alcohol or illegal drugs, may be less stable than we rightfully expect those who possess and use guns to be. It is difficult to conceive that a colonial legislature would have seen much difference between the hazard presented by an armed "lunatic" (as that term was used in colonial legislation) or an armed and intoxicated person versus

9

the hazard presented by an armed habitual user of illegal drugs. Consequently, it is equally difficult to conceive that application of the Bruen formulation requires that sort of a differentiation.

The government argues that there is in this country a long history of legislation–going back to the colonial era–regulating possession or use of guns by those who are potentially mentally unfit to live up to the responsibility inherent in possession of a gun. The government's briefs back up that assertion. Doc. no. 30 in CR-22-0368, at 12-17; doc. no. 23 in CR-22-0395, at 13-18. Moreover, on the general subject of whether mental impairment provides a constitutionally acceptable basis for regulating possession of guns, the Court in Heller was at pains to make it clear that it was not casting doubt on laws prohibiting possession of guns by the mentally ill. Heller, 554 U.S. at 626. Lest the point be lost in the ongoing debate over the scope of Second Amendment protection, that proposition was reiterated two years later in McDonald, 561 U.S. at 786. As for mental impairment due to intoxication, the court is satisfied, as was a Florida district court, that "[t]he manner in which the modern restriction [§ 922(g)(3)] burdens Second Amendment rights is comparable to how the intoxication statutes burdened those rights." Fried v. Garland, 2022 WL 16731233, at *7 (N.D. Fla. Nov. 4, 2022).[5] Drug abusers have fared no better in Second Amendment litigation because "habitual drug abusers, like

---

[5] Colonial legislators in at least two colonies–and two of the most populous ones at that–recognized that guns and alcohol were a bad combination. Virginia imposed punishment (forfeiture of 100 pounds of tobacco, among other penalties) on "[w]hat persons soever [who] shall, after publication hereof, shoot any gunns at drinkeing (marriages and funeralls only excepted)." 1655 Va. Acts 401, Acts of March 10, 1655, Act XII, in 1 Hening *The Statutes at Large: Being a Collection of all the Laws of Virginia*, 401-02 (1823). And the New York legislature recognized that "great Damages are frequently done on the Eve of the last Day of December, and on the first and second days of January by Persons going from House to House with Guns and other Fire Arms, and often being intoxicated with Liquor." N.Y. Col. Laws, vol. v, pp. 532-33 March 8, 1773), as quoted in Arthur Everett Peterson and George William Edwards, *New York as an Eighteenth Century Municipality*, Part II, p. 127 (New York: Longmans, Green & Co., 1917).

the mentally ill, are more likely to have difficulty exercising self-control, making it dangerous for them to possess deadly firearms." United States v. Yancey, 621 F.3d 681, at 685 (7th Cir. 2010).[6]  The court concludes that "§ 922(g)(3) is relevantly similar to regulations aimed at preventing dangerous or untrustworthy persons from possessing and using firearms, such as individuals convicted of felonies or suffering from mental illness," or individuals who are intoxicated.  United States v. Seiwert, 2022 WL 4534605, at *2 (N.D. Ill. Sept. 28, 2022).

V.   Conclusion.

For the reasons discussed above, Joel Keenan Lewis's motion to dismiss, doc. no. 22 in CR-22-0368-F is **DENIED**, and defendant Lequevin Kelley's motion to dismiss, doc. no. 17 in CR-22-0395-F is likewise **DENIED**.

These cases will promptly be set for status and scheduling conferences for the purpose of setting trial dates consistent with the requirements of the Speedy Trial Act.

DATED this 13th day of January, 2023.

_____
STEPHEN P. FRIOT
UNITED STATES DISTRICT JUDGE

22-0368p009.docx

---

[6] Because Yancey is a post-Heller but pre-Bruen decision, some aspects of that court's analytical approach to the Second Amendment issues (e.g., validation by looking for a substantial relation to an important governmental objective, Yancey, at 683) are not entirely aligned with the approach now required by Bruen.  That does not affect the merits of the observation quoted here.